USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/3/20

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

No. 17-cv-6493 (RJS)

AKILAH HUGHES,

Plaintiff,

VERSUS

CARL BENJAMIN *a/k/a Sargon of Akkad*,
John Does *1–10 inclusive*,

Defendants.

OPINION AND ORDER
February 3, 2020

RICHARD J. SULLIVAN, Circuit Judge:

Plaintiff Akilah Hughes brings this action against Defendant Carl Benjamin and ten "John Doe" Defendants for copyright infringement under 17 U.S.C. § 501 and misrepresentation under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512(f), principally alleging that Benjamin's YouTube video, *SJW Levels of Awareness*, unlawfully copied Hughes's YouTube video about the 2016 presidential election, *We Thought She Would Win*. Now before the Court is Benjamin's motion to dismiss the Complaint in its entirety. (Doc. No. 30.) For the reasons set forth below, the motion to dismiss is GRANTED.

I. BACKGROUND

A. The Original Work: *We Thought She Would Win*

Hughes is a popular "content creator" and filmmaker who maintains the YouTube

channel "Akilah Obviously."[1] (Doc. No. 1 ("Compl.") ¶ 12.) Her work "covers a broad range of topics[,] including comedy, race, social commentary, feminism, beauty, and fashion." (*Id.*)

On November 8, 2016, the night of the 2016 presidential election, Hughes filmed Hillary Clinton's campaign party at the Jacob Javitz Convention Center in Manhattan. (*Id.* ¶ 15.) Ten days later, Hughes posted a nine-minute-and-fifty-second video titled *We Thought She Would Win* to her YouTube channel. (*Id.* ¶ 16; Doc. No. 32, Ex. A ("Hughes Video").) The video contained her campaign party footage, as well as her thoughts on the night's events (both during the night and after the night was over), including commentary on the implications of Secretary Clinton's defeat by now-President Donald Trump. (Compl. ¶ 16; Hughes Video.) The video begins with Hughes at the Javitz Center, early in the night, stating that she is "really excited to be . . . a woman in the year 2016 after having . . . a black president for eight years and now we have Hillary who could potentially be our next president." (Hughes Video at 0:29–0:40.) The video then cuts to Hughes reflecting back on election night after Secretary Clinton's loss, noting that "no one thought she wasn't going to win, so it started out as a very exciting evening and like full of hope" before the mood "just like crept down, until forever." (*Id.* at 0:47–1:20; *see id.* at 1:20–4:38.) The final five minutes of the video consist of wide-ranging commentary, including Hughes urging her audience to "stand up" before violence is committed against minorities, her negative feelings toward the year 2016, and her gratitude for being "surrounded by like-minded people" in New York City. (*Id.* at 4:38–9:50.) Hughes alleges that she is the sole owner of the video, and that it is registered with the United States Copyright Office. (Compl. ¶ 18.)

B. The Allegedly Infringing Work: *SJW Levels of Awareness*

Benjamin, like Hughes, is a content creator and filmmaker who maintains the YouTube channels "Sargon of Akkad" and "The Thinkery," where he publishes "anti-ideological and anti-identitarian" content focusing on "'the left', racism, feminism, Black Lives Matter[], and Islam." (*Id.* ¶ 34.) Benjamin is "publicly known for his provocative style and strongly-held beliefs against liberal social and political stances." (*Id.* ¶ 35.)

The day after publishing *We Thought She Would Win*, Hughes discovered that Benjamin had posted the video *SJW Levels of Awareness*, comprised entirely of six clips of *We Thought She Would Win* totaling one minute and fifty-eight seconds, to one of his YouTube Channels.[2] (*Id.* ¶ 20; Doc. No.

---

[1] In ruling on the motion to dismiss, the Court has considered the Complaint, the YouTube counter notification attached as Exhibit A to the Complaint, and the original and allegedly infringing videos at issue (authentic copies of which were submitted to the Court (Doc. No. 32, Exs. A and C)), which are incorporated by reference into the Complaint (Doc. No. 1 ¶¶ 17, 20). *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007); *see also Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) ("In copyright infringement actions, the works themselves supersede and control contrary descriptions of them, including any contrary allegations, conclusions or descriptions of the works contained in the pleadings." (internal quotation marks and citations omitted)).

[2] The Complaint alleges that *SJW Levels of Awareness* copied one minute and twenty-eight seconds from *We Thought She Would Win* (Compl. ¶ 20), but a review of the work itself, which "supersede[s] and control[s] . . . contrary allegations . . . contained in the pleadings," *Peter F. Gaito Architecture*, 602 F.3d at 64 (internal quotation marks omitted), reveals that *SJW Levels of Awareness* copied thirty seconds more than alleged (Doc. No. 32, Ex. C).

32, Ex. C ("Benjamin Video").) According to the Complaint, "SJW" is an acronym for "social justice warrior," a term "routinely used by Benjamin in a demeaning context to belittle proponents of perceived liberal social policies and stances." (Compl. ¶ 20.) *SJW Levels of Awareness* begins with Hughes expressing her excitement over the potential election of a female president, followed by a clip depicting her subsequent disappointment over Secretary Clinton's loss. (Benjamin Video at 0:00–0:50.) *SJW Levels of Awareness* then cuts to footage of Hughes stating that Trump supporters mean to divide the country, urging people to speak out against bigotry, and observing that 2016 is the worst year of her life. (*Id.* at 0:50–1:48.) The video concludes with Hughes declaring her appreciation for living with like-minded people in New York City. (*Id.* at 1:49–1:58.) *SJW Levels of Awareness* includes no commentary or video recorded by Benjamin. (Benjamin Video; Compl. ¶ 22.)

### C. The DMCA Takedown Request and Counter Notification

After discovering Benjamin's video, Hughes submitted a "takedown notice" to YouTube pursuant to 17 U.S.C. § 512. (Compl. ¶ 24.) YouTube then disabled public access to Benjamin's video. (*Id.* ¶ 25.) On November 19, 2016, Benjamin sent Hughes an email requesting that she withdraw the takedown notice.[3] (*Id.* ¶ 26.) On November 22, 2016, after Hughes declined to withdraw her takedown notice, Benjamin sent YouTube a DMCA counter notification claiming that *SJW Levels of Awareness* was "entirely transformative . . . and intended for parody."

---

[3] On the same day, Benjamin also posted *SJW Levels of Awareness* to his Twitter account, where it remained publicly accessible until his account was suspended on August 9, 2017. (Compl. ¶¶ 28–29.)

(*Id.* ¶ 30; *id.* Ex. A.) Benjamin also stated, under penalty of perjury, that he had "a good faith belief [that *SJW Levels of Awareness*] was removed due to a mistake or misidentification of the material to be removed or disabled." (*Id.* Ex. A.) Hughes alleges that YouTube relied upon Benjamin's counter notification "to reinstate certain features of their service, including allowing for the continued public display of [*SJW Levels of Awareness*]," though she does not specify when YouTube reinstated access to Benjamin's video. (*Id.* ¶ 59.)

### D. Procedural History

Hughes initiated this action for damages and injunctive relief on August 25, 2017. Her Complaint sets forth two causes of action. First, she asserts that Benjamin infringed on her copyright of *We Thought She Would Win* through his public posting of *SJW Levels of Awareness* on YouTube and Twitter, in violation of 17 U.S.C. § 501. (*Id.* ¶¶ 45–54.) Second, she claims that Benjamin engaged in DMCA misrepresentation in violation of 17 U.S.C. § 512(f) by stating in his YouTube counter notification that *SJW Levels of Awareness* was fair use, "entirely transformative," and "intended for parody." (*Id.* ¶¶ 55–63.) On April 20, 2018, Benjamin filed a motion to dismiss Hughes's Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the ground that it failed to state a claim upon which relief can be granted. (Doc. No. 31 at 4.) Hughes filed an opposition on May 18, 2018 (Doc. No. 35), and Benjamin filed a reply on May 30, 2018 (Doc. No. 36). On June 7, 2019, Benjamin submitted a one-page letter in support of his motion to dismiss, apprising the Court of supplemental authority. (Doc. No. 37.)

## II. Legal Standard

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must "provide the grounds upon which [the] claim rests." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). Specifically, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns*, 493 F.3d at 98. However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. If the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Id.* at 570.

## III. Discussion

The Court will address Hughes's claims of copyright infringement and DMCA misrepresentation in turn.

### A. Copyright Infringement

"To establish a prima facie case of copyright infringement, a plaintiff must demonstrate '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Warner Bros. Entm't Inc. v. RDR Books*, 575 F. Supp. 2d 513, 533 (S.D.N.Y. 2008) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)). A defendant is deemed to have copied constituent elements of the plaintiff's work where "(1) the defendant has actually copied the plaintiff's work; *and* (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's." *Hamil Am., Inc. v. GFI*, 193 F.3d 92, 99 (2d Cir. 1999) (quoting *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1002 (2d Cir. 1995)). "The defendant can defeat a prima facie showing of infringement," however, "by proving that the doctrine of 'fair use' permits" his or her "employment of the plaintiff's [work]." *Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 131 (2d Cir. 2003); *see* 17 U.S.C. § 107 (codifying the common-law fair use defense).

Although fair use is an affirmative defense, and thus the defendant "bears the burden of proving it," *Fox News Network, LLC v. Tveyes, Inc.*, 883 F.3d 169, 176 (2d Cir. 2018), fair use can nevertheless be adjudicated on a motion to dismiss, *see TCA Television Corp. v. McCollum*, 839 F.3d 168, 178 (2d Cir. 2016); *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013). At this stage of the litigation, the Court's task is to determine whether "the facts necessary to establish the defense are evident on the face of the complaint," including any materials properly incorporated into the complaint. *Kelly-Brown*, 717 F.3d at 308; *see also, e.g., Clark v. Transp. Alts., Inc.*, No. 18-cv-9985 (VM), 2019 WL 1448448, at *2–5 (S.D.N.Y. Mar. 18, 2019) (dismissing complaint pursuant to Rule 12(b)(6) based on fair use defense after conducting a side-by-side analysis of the two works attached to the complaint).

In undertaking a fair use analysis, the Court considers the following non-

exhaustive list of factors set forth in 17 U.S.C. § 107:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

As the Second Circuit has explained, "the four listed statutory factors in § 107 guide but do not control [the] fair use analysis and 'are to be explored, and the results weighed together, in light of the purposes of copyright.'" *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 141 (2d Cir. 1998) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577–78 (1994)). The ultimate question is "whether the copyright law's goal of 'promoting the Progress of Science and useful Arts' . . . would be better served by allowing the use than by preventing it." *Cariou v. Prince*, 714 F.3d 694, 705 (2d Cir. 2013) (quoting *Castle Rock Entm't*, 150 F.3d at 141).

The Court will consider each of the above statutory factors.

1. Purpose and Character of Use

The first factor, "[t]he heart of the fair use inquiry," concerns the purpose and character of the allegedly infringing use. *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006) (quoting *Davis v. The Gap, Inc.*, 246 F.3d 152, 174 (2d Cir. 2001)). In the preamble to § 107, Congress identified "criticism, comment, news reporting, teaching, scholarship, and research" as illustrative purposes of a fair use. 17 U.S.C. § 107; *see TCA Television*, 839 F.3d at 179. Additionally, the commercial use of the new work "may weigh against a finding of fair use," which favors non-profit educational purposes. *Cariou*, 714 F.3d at 708 (quoting *Campbell*, 510 U.S. at 579). But because "nearly all of the illustrative uses listed in the preamble paragraph of § 107 . . . are generally conducted for profit in this country," *Campbell*, 510 U.S. at 584 (internal quotation marks omitted), courts "do not give much weight to the fact that the secondary use was for commercial gain," *Castle Rock Entm't*, 150 F.3d at 142. Instead, the critical question when applying the first fair use factor is whether the new work is "transformative." *TCA Television*, 839 F.3d at 180. Like the overall fair use determination, whether a work is "transformative" is "an open-ended and context-sensitive inquiry," *Cariou*, 714 F.3d at 705, based on "how the work in question appears to the reasonable observer," *id.* at 707. "[T]he critical inquiry is whether the new work uses the copyrighted material itself for a purpose, or imbues it with a character, different from that for which it was created." *TCA Television*, 839 F.3d at 180.

Most relevant here, a new work may be transformative even where it consists entirely of portions of the original work, or indeed even where it is an "exact replication" of the original work. *Sarl Louis Feraud Int'l v. Viewfinder Inc.*, 627 F. Supp. 2d 123, 128 (S.D.N.Y. 2008) (Lynch, J.) (collecting cases); *see also Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 84 (2d Cir. 2014) ("[A] secondary work can be transformative in function or purpose without altering or actually adding to the original work." (internal quotation marks omitted)). In *Baraban v. Time*

5

*Warner, Inc.*, for example, the court found that the first statutory fair use factor "weigh[ed] heavily in favor of fair use" where the defendant had "copie[d] the [plaintiff's] photo outright in order to comment on it and on the . . . advertising campaign in which the photo played an integral part." No. 99-cv-1569 (JSM), 2000 WL 358375, at *3–4 (S.D.N.Y. Apr. 6, 2000). The court noted that the defendant's use of the photo was not exactly "parody []or satire as those terms have been defined in the case law," but that the defendant's use of the photo in context – as part of a book containing critical commentary – nevertheless "clearly [fell] within the permissible use categories of 'comment' and 'criticism.'" *Id.* at *3; *see also, e.g., Yang v. Mic Network, Inc.*, 405 F. Supp. 3d 537, 543–45 (S.D.N.Y. 2019) (similar) (collecting cases).

Here, it is clear from the face of Hughes's Complaint that Benjamin copied portions of *We Thought She Would Win* for the transformative purposes of criticism and commentary. Beginning with the title of Benjamin's work, *SJW Levels of Awareness*, Hughes herself acknowledges that "SJW" or "social justice warrior" is a term "routinely used by Benjamin in a demeaning context to belittle proponents of perceived liberal social policies and stances." (Compl. ¶ 20.) Although Hughes contends that her own subjective awareness of the term's meaning does not establish that a "reasonable observer" would interpret the term "SJW" in a pejorative manner (Doc. No. 35 at 9), the Court concludes that "SJW" or "Social Justice Warrior" has sufficiently entered the modern lexicon such that there can be no serious dispute as to its pejorative meaning in this context. *See, e.g.*, Oxford Univ. Press, *social justice warrior*, Lexico, https://www.lexico.com/definition/social_ju stice_warrior (last updated 2019) (defining "social justice warrior" as a "derogatory" term for "[a] person who expresses or promotes socially progressive views"); Laura Wagner, *Can You Use That In A Sentence? Dictionary Adds New Words*, NPR: The Two-Way (Aug. 7, 2015, 4:08 PM), https://www.npr.org/sections/thetwo-way/2015/08/27/435232388/can-you-use-that-in-a-sentence-dictionary-adds-new-words; Abby Ohlheiser, *Why 'Social Justice Warrior,' a Gamergate Insult, Is Now a Dictionary Entry*, Wash. Post (Oct. 7, 2015, 7:00 AM), https://www.washingtonpost.com/news/the-intersect/wp/2015/10/07/why-social-justice-warrior-a-gamergate-insult-is-now-a-dictionary-entry; *see also Nix v. Hedden*, 149 U.S. 304, 307 (1893) (explaining that "dictionaries are admitted, not as evidence, but only as aids to the . . . understanding of the court").[4] And "levels of awareness" is plainly used in a sarcastic manner when combined with "SJW," implying a lack of awareness concerning social or political matters.

Moreover, the critical nature of *SJW Levels of Awareness* is apparent from the broader context of Benjamin's YouTube channel, where it was posted. *See Cariou*, 714 F.3d at 705; *see also, e.g., BWP Media USA, Inc. v. Gossip Cop Media, LLC*, 87 F. Supp. 3d 499, 507 (S.D.N.Y. 2015) (finding the use of copied photographs transformative based on the surrounding context in which they were published). As the Complaint alleges, Benjamin "routinely

---

[4] The Court takes judicial notice of the news articles (which report on the Lexico dictionary entry) for the "fact of their publication," since the articles predate Benjamin's posting of *SJW Levels of Awareness* and thus show that *SJW* was in a dictionary as a derogatory term at that time. *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 425 n.15 (S.D.N.Y. 2003) ("The Court may take judicial notice of newspaper articles for the fact of their publication without transforming the motion into one for summary judgment.").

engages and criticizes viewpoints on various social and political issues" on his YouTube channels, specifically targeting topics such as feminism, "the left," and Black Lives Matter. (Compl. ¶ 34.) Thus, whether *SJW Levels of Awareness* is accessed by searching for "SJW"-related content on YouTube or by going directly to Benjamin's YouTube channel (or in some other way), a reasonable observer who came across the video would quickly grasp its critical purpose.

Furthermore, although courts have found transformative uses even in cases involving exact copying, the Court notes that *SJW Levels of Awareness* is *not* an exact copy of *We Thought She Would Win*. Rather, Benjamin excerpted *We Thought She Would Win* to depict the specific moments he felt exemplified Hughes's political identity and lack of awareness. For example, Benjamin included Hughes's prediction and hope that Secretary Clinton would win the election, while omitting footage that did not support his message, like Hughes's statement that Secretary Clinton won the popular vote with "record numbers." And he excluded content unrelated to his criticism, like Hughes's commentary on the societal benefits of YouTube. In this way, Benjamin excerpted *We Thought She Would Win* to maximize his criticism of Hughes's liberal viewpoint.[5]

Finally, although the commercial nature of an allegedly infringing work is not necessarily a significant factor, *see, e.g., Cariou*, 714 F.3d at 708, the Court notes that the Complaint barely mentions the commercial or non-commercial nature of *SJW Levels of Awareness*. At most, the Complaint alleges generally that "Defendants have unfairly derived profits from [*SJW Levels of Awareness*] in the form of advertising revenues generated from its upload to and availability on YouTube," and "from increased popularity of their YouTube channel attributed to [*SJW Levels of Awareness*]." (Compl. ¶ 44.) The Complaint, however, does not specify how the increased popularity of Benjamin's YouTube channel commercially benefited Benjamin himself, nor does the Complaint indicate whether the referenced advertising revenues accrued to Benjamin or to YouTube. In any event, insofar as there is a commercial aspect to *SJW Levels of Awareness*, it pales in significance to the considerations discussed above. *See, e.g., Cariou*, 714 F.3d at 708 ("Although there is no question that [the defendant's] artworks are commercial, we do not place much significance on that fact due to the transformative nature of the work.").

Because a reasonable observer would plainly infer from the title of Benjamin's video, the context in which it was posted, and its selective copying, that it was intended to criticize Hughes and comment on her perceived lack of awareness, the first fair use factor favors Benjamin.

2. The Nature of the Copyrighted Work

The second fair use factor, the nature of the copyrighted work, "calls for recognition that some works are closer to the core of intended copyright protection than others," like works intended for "creative expression for public dissemination." *Campbell*, 510 U.S. at 586. Applying this factor, courts consider "(1) whether the [copyrighted] work is expressive or creative, . . . with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is

---

[5] To the extent Benjamin's selective excerpting was not "fair" to Hughes in the colloquial sense of accurately conveying her level of awareness, courts will not, except in rare circumstances, reject a fair use defense based on the inaccuracy of a critical work. *See Wojnarowicz v. Am. Family Ass'n*, 745 F. Supp. 130, 143–44 (S.D.N.Y. 1990).

published or unpublished, with the scope for fair use involving unpublished works being considerably narrower." *Blanch*, 467 F.3d at 256 (quoting 2 Howard B. Abrams, *The Law of Copyright*, § 15:52 (2006)). The second fair use factor, however, "may be of limited usefulness where the creative work of art is being used for a transformative purpose." *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 612 (2d Cir. 2006); *see also Campbell*, 510 U.S. at 586 (explaining that the nature of the copyrighted work is "not much help . . . in separating the fair use sheep from the infringing goats in a parody case, since parodies almost invariably copy publicly known, expressive works").

Here, the second fair use factor is essentially neutral and of little import. As for the first *Blanch* consideration, Hughes's work is "factual or informational" in that it provides a first-hand account of a newsworthy event, but it also has "expressive or creative" value in both its commentary and production. *Blanch*, 467 F.3d at 256 (internal quotation marks omitted). With respect to the second *Blanch* consideration, *We Thought She Would Win* is a published work, and thus the scope of fair use in this context is not "considerably narrower" than it would be if it had been unpublished. *Id.* (internal quotation marks omitted). Given these countervailing considerations, and the fact that *SJW Levels of Awareness* is plainly transformative, the second fair use factor has little impact here.

3. Amount and Substantiality of the Portion Used

The third statutory fair use factor turns on "whether 'the amount and substantiality of the portion used in relation to the copyrighted work as a whole' . . . [is] reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586 (quoting 17 U.S.C. § 107). In assessing this factor, the Court considers "not only 'the quantity of the materials used' but also 'their quality and importance.'" *TCA Television*, 839 F.3d at 185 (quoting *Campbell*, 510 U.S. at 587). "The crux of the inquiry is whether 'no more [content] was taken than necessary,'" given the purpose and character of the allegedly infringing use. *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 98 (2d Cir. 2014) (quoting *Campbell*, 510 U.S. at 589); *see also Bill Graham Archives*, 448 F.3d at 613 ("[T]he third-factor inquiry must take into account that . . . the extent of permissible copying varies with the purpose and character of the use." (internal quotation marks omitted)). Thus, the third factor may favor the defendant even where the defendant copies an entire work, provided that such copying was reasonably necessary in relation to the work's transformative purpose. *See, e.g., Authors Guild*, 755 F.3d at 98–99; *see also, e.g., Swatch Grp. Mgmt. Servs.*, 756 F.3d at 90 (concluding that the third fair use factor was neutral where an entire work was copied).

Here, *SJW Levels of Awareness* copied 20% of *We Thought She Would Win*, a percentage which, while greater than that found unreasonable in some cases in this Circuit, *see Robinson v. Random House, Inc.*, 877 F. Supp. 830, 842 (S.D.N.Y. 1995) (collecting cases), was still far less than the entire video, *see, e.g., Authors Guild*, 755 F.3d at 98. In addition, although the selected excerpts were important to Hughes's video (at least as important as any other part of her video), they were also linked to the critical purpose of *SJW Levels of Awareness*. As noted above, Benjamin did not copy parts of Hughes's video that undermined or were unrelated to the critical purpose of *SJW Levels of Awareness*. Notably, Benjamin also did not copy every part of *We Thought She Would Win* that evinced Hughes's progressive views.

Rather, Benjamin copied as much of *We Thought She Would Win* as was deemed reasonably necessary for him to convey his critical message. In these circumstances, the third factor tips in favor of Benjamin.

### 4. The Effect on the Potential Market for the Copyrighted Work

The fourth fair use factor concerns "whether the secondary use usurps the market of the original work." *Blanch*, 467 F.3d at 258 (quoting *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 482 (2d Cir. 2004)). A defendant usurps the original work's market when "the infringer's target audience and the nature of the infringing content is the same as the original." *Cariou*, 714 F.3d at 709. Thus, "[t]he more transformative the secondary use, the less [the] likelihood that the secondary use substitutes for the original." *Castle Rock Entm't*, 150 F.3d at 145.

Here, there is no danger that *SJW Levels of Awareness* will usurp the market of progressive commentaries such as *We Thought She Would Win*. Benjamin's target audience (generally political conservatives and libertarians) is obviously not the same as Hughes's target audience (generally political liberals). *See Cariou*, 714 F.3d at 709. Moreover, although *SJW Levels of Awareness* is comprised entirely of portions of *We Thought She Would Win*, there is no reason to think that Hughes's audience will abandon her progressive YouTube channel to watch the derisively-titled *SJW Levels of Awareness* on a conservative YouTube channel simply because it contains parts of her work. Thus, the fourth fair use factor, like the first and third factors, favors Benjamin.

Because three of the four statutory fair use factors favor Benjamin, including the most important factor (purpose and character of use), and the least important factor (nature of the copyrighted work) is neutral, the Court concludes that the fair use defense clearly applies based on the face of Hughes's Complaint and a review of the videos themselves. Accordingly, Hughes has failed to state a claim of copyright infringement for purposes of Rule 12(b)(6).

### B. DMCA Misrepresentation

The DMCA allows online service providers to avoid copyright liability if they comply with the procedures set forth in 17 U.S.C. § 512. *See Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1151 (9th Cir. 2016). Specifically, a service provider may avail itself of the safe harbor provisions in Section 512 by "expeditiously" disabling access to allegedly infringing material upon receipt of a so-called "takedown notice." 17 U.S.C. § 512(c)(1)(C). A copyright owner who submits a takedown notice must include a statement, under penalty of perjury, that she has "a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner." *Id.* § 512(c)(3)(A)(v)–(vi). In response, the creator of the allegedly infringing work may file a "counter notification," in which the alleged infringer must attest "under penalty of perjury that the subscriber has a good faith belief that the material was removed or disabled as a result of mistake or misidentification of the material to be removed or disabled." *Id.* § 512(g)(3)(C). Upon receipt of the counter notification, the service provider can again avoid liability by restoring access to the allegedly infringing material in ten to fourteen business days. *Id.* § 512(g)(2)(C). However, "[a]ny person who knowingly materially misrepresents under this section . . . that material or activity was removed or disabled by mistake or misidentification" is liable for damages, including costs and attorney's fees, incurred by the copyright holder "as the result of the service provider relying upon such

misrepresentation in . . . replacing the removed material or ceasing to disable access to it." *Id.* § 512(f).

Here, Hughes alleges that Benjamin knowingly and materially misrepresented in his counter notification that *SJW Levels of Awareness* was fair use, "entirely transformative," and "intended for parody." (Compl. ¶¶ 30, 57–58; *id.* Ex. A.) These allegations fall short. Benjamin's implied statement that his video constituted fair use (the counter notification itself does not actually use the term "fair use") was accurate for the reasons stated in this Opinion and Order. As a court in this district has explained, "[i]t is self-evident that a statement cannot be a 'misrepresentation' for purposes of 17 U.S.C. § 512(f) if it is factually accurate," *Hosseinzadeh v. Klein*, 276 F. Supp. 3d 34, 47 (S.D.N.Y. 2017), and the same is of course true for statements that are legally accurate. Similarly, Benjamin did not misrepresent that his video was "transformative." Whether it was "*entirely* transformative," as stated in his counter notification, or merely "transformative," is immaterial as a legal matter. *Cf. Kshetrapal v. Dish Network, LLC*, No. 14-cv-3527 (PAC), 2018 WL 1474375, at *15 (S.D.N.Y. Mar. 23, 2018) (explaining, in the defamation context, that plaintiff's "exaggerat[ion]" was "mere hyperbole or a matter of opinion, and not false"). Last, the Complaint fails to plausibly plead a misrepresentation in the form of Benjamin's statement that *SJW Levels of Awareness* was "intended for parody." (Compl. ¶ 58; *id.* Ex. A.) Even if *SJW Levels of Awareness* was not, strictly speaking, "parody" as that term has been defined in the case law, *Baraban*, 2000 WL 358375, at *3, the difference between "parody" and non-parodic copying for the purpose of mocking criticism is subtle, and ultimately immaterial here. Moreover, it is implausible to suggest that Benjamin knowingly adopted one of these two characterizations over the other in an effort to mask his intentions. Because the Complaint therefore does not plausibly allege that Benjamin made misrepresentations in his counter notification, let alone knowing and material misrepresentations, Hughes's DMCA claim fails.

IV. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED THAT Benjamin's motion to dismiss is GRANTED. Although Hughes has not requested leave to amend the Complaint, the Court notes that leave to amend would be futile. The Court's analysis above is principally based on its review of the two works at issue and the context in which they were posted, rather than any allegations that may be refined in amended pleadings. Thus, the dismissal is with prejudice, and the Clerk of Court is respectfully directed to terminate the motion pending at document number 30 and close this case.

SO ORDERED.

RICHARD J. SULLIVAN
United States Circuit Judge
Sitting by Designation

Dated: February 3, 2020
New York, New York

\* \* \*

Akilah Hughes is represented by Kristin Grant of Grant Attorneys at Law PLLC, 40 Exchange Place, Suite 1306, New York, New York, 10005.

Carl Benjamin is represented by Wesley Mullen of Mullen P.C., 200 Park Avenue, Suite 1700, New York, New York, 10166.